What is "income" from capital stock, to which a life tenant is entitled under a will, as distinguished from "principal," to which the remainderman is entitled, depends largely on testator's presumed intention.

[Ed. Note.—For other cases, see Life Estates, Cent. Dig. §§ 21, 34, 35; Dec. Dig. § 15.*

For other definitions, see Words and Phrases, vol. 4, pp. 3501–3507; vol. 8, p. 7685; vol. 6, pp. 5552–5557; vol. 8, p. 7763.]

2. LIFE ESTATES (§ 15*)—"DIVIDEND"—WHAT CONSTITUTES.

A transfer of assets by a railway company to a trustee and subsequent issue of participation certificates by the trustee do not constitute a "dividend" on stock, so as to entitle a life tenant under a stockholder's will to it as against the remainderman.

[Ed. Note.—For other cases, see Life Estates, Cent. Dig. §§ 21, 34, 35; Dec. Dig. § 15.*]

For other definitions, see Words and Phrases, vol. 3, pp. 2143–2147.]

In the matter of the estate of Margaret Rea Agnew Bunker, deceased.   On accounting by the executors.   Decree directed.

Frederick S. Woodruff, for William Bunker, as executor and life tenant.

Parsons, Closson & McIlvaine (William E. Carnochan, of counsel), for remaindermen.

FOWLER, S.   The question to be decided by the surrogate arises on the accounting of the three executors of Mrs. Margaret Rea Agnew Bunker, deceased.   The parties before me have agreed concerning what documentary evidence should be submitted, and also that that documentary evidence covers all the facts.   The question thus put to the surrogate is:   Shall certain trustees' certificates, referred to in said documents, be treated as capital or as income?

In the account before me they are stated in separate schedules and left subject to the determination of the surrogate.   The life tenant and the two remaindermen are named as the executors under the will of Mrs. Bunker.   The following is what I conceive to be a synopsis of the documentary evidence submitted to the surrogate:

The late Mrs. Bunker, whose estate is involved in this accounting, was at the times hereinafter referred to a shareholder in the Great Northern Railway Company.

On October 20, 1899, a contract was entered into between the Great Northern Railway Company and the Lake Superior Company, Limited, by the terms of which it was agreed that, in consideration of the Great Northern Railway Company having transferred to the said Superior Company certain stocks, bonds, and properties enumerated therein:   First.   The Superior Company should not dispose of the same, without the consent of the Northern Company.   Second.   The Superior Company should pay out of the income all taxes and certain ex-

penses referred to therein. Third. The Superior Company would, when requested by the Northern Company, pay the balance of the income to the stockholders of the Northern Company as they may appear of record at the date of closing the stock transfer books of that company for some regular dividend, ratably in proportion to their respective holdings of Northern Company's stock. The board of directors of the Northern Company might, by resolution approved by its stockholders, direct that such profits, income, or dividends received of the Superior Company, instead of being put out in the form of dividends to the stockholders of the Northern Company, should be used for the purpose of acquiring other property or for such other uses and purposes and upon such terms and conditions as may be set forth in such resolution. Fourth. The Northern Company might, by resolution approved by its stockholders, authorize or direct the Superior Company to lease, sell, or transfer any or all of said earnings transferred to them as aforesaid by the Northern Company. Fifth. Upon demand of the Northern Company, made by resolution of its board of directors, approved by its stockholders, the Superior Company agreed to transfer the stocks, bonds, and properties held by it hereunder to the Northern Company, or to such other body or person as might be designated by said resolution. Sixth. Action of the stockholders of the Northern Company authorized or required under this contract shall be in the form of resolutions adopted at their annual meeting, etc. Seventh. Provided that copies of resolutions of the Northern Company or its stockholders should be delivered to the Superior Company.

Such, in brief, was the contract. This contract was entered into on the aforesaid 20th day of October, 1899, by the officers of the two corporations. On the same day the stockholders of the Northern Company ratified the agreement by resolution as follows:

"Whereas, the stocks, bonds, and properties transferred to the Superior Company by such contract were acquired with funds which might otherwise have been lawfully distributed in the form of dividends to and among the stockholders of this company, and such stocks, bonds, and properties have been held subject to division among such stockholders through a sale and distribution of proceeds or otherwise; and whereas, it is in the interest of the stockholders of this company and their desire that the properties, stocks, and bonds transferred by said contract, instead of being sold or divided, be kept together and the property used and the business of the companies represented by the stocks and bonds managed and controlled in connection and concurrently with the operation of the Great Northern Railway Company; and whereas, to that end said contract was executed, and the right to assign or transfer stocks or properties of either of such corporations was fixed and limited as therein expressed: Resolved, that said contract and its execution by the vice president of the Great Northern Railway Company be in all respects ratified, approved, and confirmed."

The report of the president and directors of the Northern Company for the year ending June 30, 1900, contained the following:

"This company has from time to time become interested in properties or companies not strictly a part of the railway system, but of direct or indirect benefit to it, such as coal mines, iron mines, elevators, docks at Buffalo, New York, etc. It is considered that these properties can be handled to better advantage by a separate company. To this end the Lake Su-

perior Company, Limited, has been organized, and there has been trans-ferred to it during the year all of the Great Northern's interest in the Great Northern Express Company, Great Northern Elevator Company, Sand Coulee Coal Company, and other outside companies. The income from these prop-erties or securities, unless reinvested, will belong to the Great Northern's shareholders. The title to these securities, etc., having by this transfer passed from the Great Northern Railway Company to the Lake Superior Company, trustee, the sum of $1,851,364.92 has been charged against profits and loss, as shown by table on page 34, on account of part of their cost. This will also explain why the earnings, expenses, etc., of the Great Northern Express Company and Sand Coulee Coal Company have not this year been included in the revenue table printed on page 32, as has been the practice in former years."

The profit and loss account referred to in the above is set forth as follows in the account:

| | | |
|---|---:|---:|
| Credit balance July 1, 1899.................................... | $2,317,841 | 97 |
| Amount transferred from income account for year ended June 30, 1900, as above...................................... | 2,217,763 | 74 |
| Total credit......................................... | $4,535,605 | 71 |
| Against which has been charged on account of securities trans-ferred to Lake Superior Company, Limited, as explained on page 11 ................................................. | 1,851,364 | 92 |
| Leaving the credit balance June 30, 1900.................... | $2,684,240 | 79 |

Mrs. Bunker died on August 1, 1906, leaving a will the pertinent portion of which is as follows:

"Eighth, I give, devise and bequeath the net rents, profits and income of all the rest, residue and remainder of all my property and estate, real and personal, of which I shall die seised or possessed, or to which I shall be in any way entitled at the time of my death, to my husband, William Bunker, during his life and the principal thereof, after his death, to my sisters, Elizabeth Agnew and Mary Agnew, share and share alike, to have and to hold to them and their heirs forever.

"Ninth, I appoint my husband William Bunker, and my sisters, Elizabeth Agnew and Mary Agnew, executors of this will."

Subsequently, and at a meeting of the directors of the Great North-ern Company held November 14, 1906, resolutions were adopted which—

Resolved, that the Lake Superior Company, Limited, be and is hereby authorized and directed to assign, transfer and deliver to Louis W. Hill, James N. Hill, Walter J. Hill, and Edward T. Nichols, to be by them held in trust for the uses and purposes, with the powers and authority and upon the conditions substantially as set forth in the draft of trust agreement stated at length in these minutes, the following stocks and securities now held by the said Lake Superior Company, Limited, under a contract dated the 20th day of October, 1899, entered into between it and this company: (Here follows a list of stocks and securities).

Resolved, further, that the said trust be and is hereby created for the benefit pro rata of those persons who shall be shareholders of this company, registered and appearing as such upon its books at the close of business on the 6th day of December, A. D. 1906. Certificates of such beneficial in-terest as provided in said trust agreement are to be issued by the trustees as soon as practicable to the persons entitled thereto.

Resolved, further, that for the purpose of determining the persons who shall be entitled to share in said trust the president and secretary of this

company shall cause to be prepared a duly certified and true and accurate list of the persons who shall be shareholders at the close of business on said 6th day of December, 1906.

The following are what I regard as the salient points of the trust agreement referred to in the above resolution:

Agreement made this 7th day of December, A. D. 1906, by and between the Lake Superior Company, Limited, and Louis W. Hill and three others, parties of the second part, witnesseth:

Whereas, the party of the first part has acquired the shares of stock hereinafter described and transferred, and now holds the same for the benefit of the shareholders of the Great Northern Railway Company, etc.: Now, therefore, the party of the first part assigns to the parties of the second part, called trustees, the following personal property—enumerating stocks and bonds above referred to. To have and to hold all and sundry the said shares of stock, etc. In trust, however, to hold, use and dispose of the said property and of income and proceeds thereof upon the trust herein expressed for and during the lives of the following named persons and the life of the last survivor of them and for and during the twenty years next following the death of the said survivor unless said trust shall be sooner determined. (Here follow the names of about 18 persons.)

Said trustees shall collect all income, etc., from said property. Said trustees shall out of the moneys so received by them pay all expenses, etc., of said trust. After payment made of or provisions made for the expenses of said trust, the said trustees shall from time to time and at least once in every year distribute and pay said portion of the net income and proceeds of the property held by them as such trustees as they may deem proper, to be so distributed among and to the persons appearing as shareholders of the Great Northern Railway Company, registered as such upon its books at the close of business on the 6th day of December, 1906. The interest of the persons made beneficiaries under said trust shall consist of 1,500,000 equal shares, each original beneficiary being entitled to receive the number of shares and a certificate therefor, as hereinafter provided in said trust, as equals the number of shares of stock of the Great Northern Railway Company registered as of the date aforesaid in his name as a holder thereof on the books of said company. The interest of each and every beneficiary in said trust, is and shall continue to be limited to the right to receive his proportional share of dividends in such distributions as shall from time to time have been determined on and declared by said trustees as hereinbefore provided.

The trustees shall cause to be prepared certificates of beneficial interest under said trust, and each certificate shall state the proportional interest or number of shares to which the person named therein is entitled to under said trust. The trustees shall have full power during the continuance of the trust to sell or exchange for other property or otherwise dispose of any of the shares of stock hereby transferred to them or any property that may ever become subject to the trust, to invest the proceeds of such sale and other property which shall be held by them under the same trust, etc. Upon the expiration of the 20 years following the death of the last survivor of the before-mentioned persons upon whose lives the said trust is limited, the trustees shall at once proceed to wind up the affairs of the said trust. After paying off all the expenses and obligations of the trust they shall distribute ratably among the certificate holders all moneys remaining in their hands as such trustees, and shall convey and transfer unto the party of the first part or its successors and assigns all property save said moneys held by them under said trust.

There is also submitted to the surrogate a copy of the resolution of the stockholders of the Great Northern Railway Company held November 19, 1906, which in all respects ratifies, confirms, and approves the foregoing resolutions adopted by the board of directors on the

14th day of November, 1906, authorizing the Lake Superior Company to make the assignment referred to therein to Louis W. Hill et al. as trustees. Exhibit No. 1 appears to be a copy of the certificate of beneficial interest above referred to issued by Louis W. Hill et al. as trustees. Exhibit No. 3 is a printed copy of the application made by the aforesaid trustees to the Stock Exchange in Wall street to list the certificate of beneficial interest. It is a long printed document of three pages, giving a history of the actions and proceedings to which I have heretofore referred, but upon reading the same it does not seem to me that there is anything especially helpful in the solution of this matter. Exhibit No. 2 is a letter from L. C. Gilman to Mr. Edward T. Nichols, one of the trustees of the Great Northern iron ore properties, giving his version of the status of the iron ore properties on August 1, 1906. This was the date of the death of Mrs. Bunker. It appears from one of the briefs that Mr. L. C. Gilman is counsel for the Great Northern Railway Company, and Mr. Nichols, to whom the letter was addressed, was one of the trustees. It is on such evidence that the surrogate is requested to determine the controversy between the parties to this proceeding over the holdings, once of Mrs. Bunker, in the Great Northern Railway Company. The life tenant is claiming that the 480 trust certificates so issued as aforesaid accrued to him as life tenant under the will of Mrs. Bunker. This the remaindermen deny.

[1] It has been sometimes suggested that the true basis of distinction between capital and income where shares are left to tenant for life is to be determined by the presumed intention of the testator himself. In England, where such questions are frequent, Lord Lindley (In re Armitage [1893] 3 Ch. 337, 346) was of the opinion that the testator could not be presumed to intend that the life tenant should have such profits as arose by realization of shares, i. e., the difference between book values and realized values of the shares. Lord Lindley was of the opinion "that a testator 'could never dream of such profits' going to the tenant for life." But in that country Bouch v. Sproule (12 App. Cas. 385) is a leading authority on such subjects. It was there held that "what the company says is income shall be income, and what it says is capital shall be capital." This conclusion is not inconsistent with the suggestion, which I have noticed, that testator's intention should govern, for if alive testator probably would regard as income that which his company declared to be income, and he would treat as capital that which was so considered by the corporation. This would be prudent. I do not think the authorities of our own state differ materially from the law stated. That the corporation is in the first instance the judge of what assets are to be regarded as capital and what as dividends is implied in Jermain v. Lake Shore & Mich. L. R. Co., 91 N. Y. 483, 492, and other cases.

[2] But without regard to the point just noticed, and without going into it, it is clear to me in this matter that some seven years before Mrs. Bunker died the Great Northern Railway Company, of which she was a shareholder, finding itself in possession and control of valuable properties either through purchase or by reason of the

ownership of certain stocks in other corporations, organized or caused to be organized a separate company, the Lake Superior Company, Limited, and the Great Northern Company then set apart to the said Superior Company the particular properties in question. This situation continued until November, 1906. Mrs. Bunker died on August 1, 1906. She was then a shareholder in the Great Northern Railway Company, and as such shareholder she was interested in the property so transferred to the Superior Company by the Great Northern Company as before stated. All that has happened since Mrs. Bunker's death is that the Superior Company has ceased to manage the trust property of the Great Northern Company, and its successor trustees have issued trustees' certificates, evidencing the interest which Mrs. Bunker once had in the property originally conveyed to the Superior Company. No doubt Mrs. Bunker in her lifetime regarded the interest which she had in the property so conveyed by the Great Northern Company to the Superior Company as part of her own capital and not as her income. This property in question was a part of the book value of her Great Northern shares. The income derived by her from the property so conveyed by the Great Northern Company would have been a part of her own income and not a part of her capital. Her intention in her own will, no doubt, coincides with her own situation in respect of her Great Northern holdings. What was capital as to herself would be capital as to the life tenant nominated in her will to take over or succeed to her holdings in the Great Northern Company.

But the judgment need not rest on that point. I am of the opinion that no dividend in fact has been declared at all of the properties which were transferred originally by the Great Northern Company to the Superior Company. By the terms of the contract made by the grantor company with the Superior Company, such properties were to be held subject to the control of the Great Northern Company and were to be transferred by the Superior Company to such other body or persons as might be designated by the Great Northern Company. The only direct interest which the stockholders of the Great Northern Company had in said properties so conveyed was the right to receive the balance of income when paid to them at the request of the Northern Company. When these securities were transferred by the Superior Company to trustees, I think conditions were not changed, and the certificates which were issued to shareholders of the Great Northern Company were only tangible evidences of what they were entitled to as dividends on said trust property, and the holders of such certificates had no more right in the said trust property than they had under the former contract of their corporation.

In this connection I would call attention to that clause of the contract entered into between the Superior Company and the trustees now controlling the properties to the effect that upon the expiration of the 20 years following the death of the last surviving mentioned persons upon whose lives the said trust is limited, the trustees shall at once proceed to wind up the affairs of the said trust. After paying off all the expenses and obligations of the trust they shall dis-

tribute ratably among the surviving certificate holders all moneys remaining in their hands as such trustees, and shall convey and transfer unto the party of the first part or its successors and assigns all property save said moneys held by them in said trust. Thus it will be seen that the money in the hands of the trustees (which presumably would be the undivided earnings of the stocks, etc.) should be paid to the certificate holders, but that all the property save said moneys should be paid back to the party of the first part. It would then come into the control of the said party of the first part, the Superior Company, but still subject to the orders and directions of the Northern Company. Thus it will be seen that the trust property so conveyed by it will eventually come back under the control of the Great Northern Railway Company.

My conclusion is that there has been no dividend in so far as the principal of said trust fund of Mrs. Bunker's estate is concerned. The contention of the remaindermen under Mrs. Bunker's will, to the effect that the 480 trust certificates in question should continue to be held as the principal of the capital estate, is sustained.

Decree accordingly.